[Cite as *State v. Hess*, 2012-Ohio-4516.]


IN THE COURT OF APPEALS OF OHIO
THIRD APPELLATE DISTRICT
SENECA COUNTY


STATE OF OHIO,

    PLAINTIFF-APPELLEE,                 CASE NO.  13-12-11

    v.

MATTHEW A. HESS,                   O P I N I O N

    DEFENDANT-APPELLANT.


Appeal from Seneca County Common Pleas Court
Trial Court No. 11-CR-0027

Judgment Affirmed

Date of Decision:   October 1, 2012


APPEARANCES:

    *Scott B. Johnson*  for Appellant

    *Derek W. DeVine and Heather N. Jans*  for Appellee

**PRESTON, J.**

{¶1} Defendant-appellant, Matthew Hess, appeals the Seneca County Court of Common Pleas' conviction by jury trial of theft and forgery. Hess argues his conviction is against the manifest weight of the evidence. For the reasons that follow, we affirm.

{¶2} On March 2, 2011, a Seneca County grand jury indicted Hess of one count of theft in violation of R.C. 2913.02(A)(1), a felony of the fifth degree, and one count of forgery in violation of R.C. 2913.21(A)(3), a felony of the fifth degree. (Doc. No. 1). Hess' indictment was based on allegations that Hess had stolen three checks from his ex-girlfriend, Valerie Puffenberger, forged her signature on them, and cashed the checks to steal money from her account.

{¶3} On March 14, 2011, the trial court held an arraignment hearing. (Doc. No. 10). Hess entered a plea of not guilty to the charges. (*Id.*). The trial court held a jury trial on October 3 through 4, 2011. (Doc. No. 42). The jury found Hess guilty of theft and forgery. (Doc. Nos. 41-42).

{¶4} On February 17, 2012, the trial court held a sentencing hearing. (Doc. No. 49). The trial court sentenced Hess to three years of community control for each offense, to be served concurrently. (*Id.*). The trial court ordered Hess to serve six months in the Seneca County Jail, but determined that Hess was eligible for house arrest with electronic monitoring in lieu of jail. (*Id.*). Additionally, the

trial court ordered Hess to serve 90 days in the Seneca County Jail, to undergo counseling and substance abuse treatment, and to pay restitution of $500. (*Id.*).

{¶5} On February 24, 2012, Hess filed a notice of appeal. (Doc. No. 50). Hess now raises one assignment of error for our review.

**Assignment of Error No. I**

**The defendant's conviction was not supported by the manifest weight of the evidence**

{¶6} In his sole assignment of error, Hess argues that his conviction was against the manifest weight of the evidence. Hess contends that the State failed to prove he intended to defraud Puffenberger, and that the State also failed to prove Puffenberger had not consented to him taking the money from her checking account. Hess argues that he and Puffenberger had recently ended their ten-year relationship at the time of the incident, that she was upset about his infidelity, and that she was angry about repaying a truck loan she had co-signed for Hess. Hess contends that Puffenberger had previously permitted him to fill in the amounts on a check, and that she had given him the checks to help him financially until he was able to move to Cincinnati with her and their children. According to Hess, this evidence demonstrates that he had Puffenberger's permission to write himself checks from her checkbook, and that her allegations were based on her anger that he had not moved to Cincinnati as she had requested.

**{¶7}** In determining whether a conviction is against the manifest weight of the evidence, a reviewing court must examine the entire record, "'[weigh] the evidence and all reasonable inferences, consider the credibility of witnesses and [determine] whether in resolving conflicts in the evidence, the [trier of fact] clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.'" *State v. Thompkins*, 78 Ohio St.3d 380, 387 (1997), quoting *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist.1983). A reviewing court must, however, allow the trier of fact appropriate discretion on matters relating to the weight of the evidence and the credibility of the witnesses. *State v. DeHass*, 10 Ohio St.2d 230, 231 (1967).

**{¶8}** Hess was convicted of theft and forgery. R.C. 2913.02(A)(1), the theft statute, states, "[n]o person, with purpose to deprive the owner of property or services, shall knowingly obtain or exert control over either the property or services in any of the following ways: (1) [w]ithout the consent of the owner or person authorized to give consent." R.C. 2913.31(A)(3), the forgery statute, states, "[n]o person, with purpose to defraud, or knowing that the person is facilitating a fraud, shall do any of the following: * * * (3) [u]tter, or possess with purpose to utter, any writing that the person knows to have been forged." R.C. 2913.01(H) defines the word "utter" as "to issue, publish, transfer, use, put or send into circulation, deliver, or display."

{¶9} The evidence presented at trial supports Hess' convictions. Officer Doug Skornicka testified that he responded to a theft and forgery complaint from Puffenberger on October 15, 2010. (Oct. 3, 2011 Tr. at 130). Skornicka testified that when he met with Puffenberger, she "was crying, upset, distraught. She was talking on the phone with her bank at the time." (*Id*. at 131). Skornicka collected handwriting samples from Hess and Puffenberger that were sent to the Bureau of Criminal Investigation ("BCI"). (*Id*. at 134-136).

{¶10} Hess also submitted a sworn written statement to law enforcement. (Ex. 6). According to Hess' statement, Puffenberger and he had lived together and had two children together. (*Id*.). Their relationship ended in the beginning of 2010, but they began reconciling in July 2010. (*Id*.). According to Hess, Puffenberger planned to start a new job in Cincinnati and wanted Hess to move with her. (*Id*.). Hess agreed to move to Cincinnati, but had a business that he needed to sell first. (*Id*.). Hess was concerned about his finances if he was unemployed, and Hess claimed Puffenberger told him to use her checks to pay his rent and bills until he moved. (*Id*.). Hess did not immediately move to Cincinnati because he had agreed to help the person who purchased his business transition. (*Id*.). According to Hess' statement, Puffenberger called him and told him they needed to move in a week so she could begin her job. (*Id*.). Hess told her he

could not move at that time, and "she flipped out on me and said she was going to [the] police and say she didn't let me use [the] checks * * *." (*Id*.).

{¶11} Puffenberger testified that she was the sole name on the checking account and that she noticed that her account balance had significantly decreased in October 2010. (Oct. 3, 2011 Tr. at 153-154). Puffenberger testified that she called the bank and checked the digital printout of the checks, and "three of them were wrote to [Hess] with my signature. So I was in hysterics, I went and looked in my checkbook and I noticed that the check numbers when I was looking through, the checks were missing and the duplicate carbon copies were also missing." (*Id*. at 156). Puffenberger testified she did not normally remove the carbon copy beneath the checks, that she had not written the checks to Hess, and she had not given him permission to use them. (*Id*. at 158, 172). According to Puffenberger, there were two occasions in the weeks before the incident when Hess had access to her checkbook. (*Id*. at 160). The first occasion was when she took their children to Hedges Boyer Park and he stopped by to drop off some coloring books for the children. (*Id*. at 161-162). Puffenberger testified that Hess requested to leave the books in the car so they would be a surprise. (*Id*.). Puffenberger testified that she handed Hess her keys and he went to the car, "I leave my purse in the car, shoved under like the driver's seat, and I notice him- not thinking anything of it- putting the books on the passenger side, leaning over the

driver's side. Comes back up, says he has to leave, and that was the end of it."
(*Id.*). Puffenberger testified that Hess had access to her checkbook for the second time when she went to his house to discuss her moving to Cincinnati with the children. (*Id.* at 160). According to Puffenberger, "[w]e were talking, got up to go to the restroom. Me knowing him for so long, I just leave my purse and I don't think anything of it that, I mean, anything is going to happen." (*Id.*).

{¶12} Puffenberger admitted under cross examination that there were a few instances when she had helped Hess with his finances. Puffenberger testified that she had co-signed a truck loan and that Hess had failed to make the payments so the truck was repossessed in April 2010. (*Id.* at 163). Puffenberger testified that she settled with the bank for $5,000 because the bank wanted her to make the payments on the truck. (*Id.*). According to Puffenberger, she had also written a check to Hess' mother a few months before the trial "[b]ecause [Hess] said that he was gonna plead and take probation and he needed help." (*Id.* at 169). Puffenberger also admitted that she and Hess had taken the children to a hotel in September 2011 and that she had paid for the hotel. (*Id.* at 170). However, Puffenberger denied Hess' claim that she had requested him to move to Cincinnati with her and further testified that their relationship was over. (*Id.* at 168).

{¶13} Jessica Toms, a forensic scientist at BCI, testified that she had analyzed the handwriting on the checks using the known handwriting samples

collected from Hess and Puffenberger. (*Id*. at 180, 186). Toms testified that she was able to identify Hess as the drafter of all three checks, with the exception of the signature on one of the checks. (*Id*. at 187-188). Hess testified that she was unable to identify the maker of the signature on that check because it was unnaturally written, "I can't tell whether it's a tracing, whether the pen was bad, whether it's an attempt to copy somebody's handwriting." (*Id*. at 188). Toms further testified:

> [m]y opinion is that check numbers 1039 and 1040, or 1044, State Exhibits 3 and 5, were written by the writer of the [Hess] samples in State's Exhibit No. 1. And the body of check 1040, State's Exhibit No. 4, was also written by the writer of the [Hess] samples, States Exhibit 1, with the exception of the maker's signature. Again, because it was unnaturally written, I can't offer an opinion as the writer of that maker's signature.

**{¶14}** After reviewing the evidence, we cannot find that Hess' conviction is against the manifest weight of the evidence. "A defendant is not entitled to a reversal on manifest weight grounds merely because inconsistent evidence was offered at trial." *State v. Baatin*, 10th Dist. No. 11AP-286, 2011-Ohio-6294, ¶ 13, citing *State v. Campbell*, 10th Dist. No. 07AP-1001, 2008-Ohio-4831, ¶ 23. While Hess correctly argues that his explanation of the incident is inconsistent with

Puffenberger's allegations, these inconsistencies do not render the conviction against the manifest weight of the evidence. The jury was aware of Hess' statement, but chose to believe Puffenberger's testimony, which is within the province of the jury. *Baatin* at ¶ 13. Puffenberger's testimony establishes that Hess committed forgery by writing her signature on the checks, and theft by taking the checks and money from Puffenberger's account.

{¶15} Hess' assignment of error is, therefore, overruled.

{¶16} Having found no error prejudicial to the appellant herein in the particulars assigned and argued, we affirm the judgment of the trial court.

*Judgment Affirmed*

**SHAW, P.J. and WILLAMOWSKI, J., concur.**

**/jlr**